**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 5-7-14
```

DANIEL SANCHEZ,                    :
                                   :
                    Plaintiff,     :          **REPORT AND**
                                   :          **RECOMMENDATION**
          - against -             :
                                   :          **12 Civ. 6203 (CM) (RLE)**
CAROLYN W. COLVIN,                 :
**Acting Commissioner of Social Security,**   :
                                   :
                    Defendant.     :
                                   :

**TO THE HONORABLE COLLEEN McMAHON, U.S.D.J.:**

## I.  INTRODUCTION

*Pro se* Plaintiff Daniel Sanchez ("Sanchez") commenced this action under the Social

Security Act (the "Act"), 42 U.S.C. § 405(g) and/or 42 U.S.C. § 1383(c)(3), challenging a final

decision of the Commissioner of Social Security (the "Commissioner") denying his claim for

disability benefits.  Sanchez argues that the decision of the Administrative Law Judge (the

"ALJ") was erroneous and not supported by substantial evidence.  On July 17, 2013, the

Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure, asking the Court to affirm the Commissioner's decision and dismiss

the Complaint.  (Mem. Of Law in Supp. of Def.'s Mot. For J. on the Pleadings ("Def. Mem."))

Sanchez's response was due on July 21, 2013, (*see* Doc. No. 19), but he failed to respond.  The

Court contacted Sanchez by telephone, and Sanchez indicated that he would call the Court back,

but he failed to do so.  By Order dated December 11, 2013, Sanchez's time to file his opposition

was extended, *sua sponte*, until December 27, 2013.  (Doc. No. 26.)  Sanchez was instructed that

his failure to comply with the Order would result in the Court considering the matter fully

briefed, and that the Court would decide the case based on the government's submission alone. (*Id.*) Sanchez did not file a response and did not contact the Court. For the reasons that follow, I recommend that the Commissioner's motion be **DENIED** and the case be **REMANDED**, for the ALJ to explain his reasoning with regard to Sanchez's treating physicians.

## II. BACKGROUND

### A. Procedural History

Sanchez filed for Social Security Income ("SSI") and disability insurance benefits on October 21 and 22, 2009, respectively, alleging that he was injured, and had become unable to work on January 10, 2009. (Tr. of Admin. Proceedings ("Tr.") at 242-43).) The application was denied (Tr. at 246-51), and on May 11, 2009, Sanchez requested a hearing before an ALJ. (*Id.* at 252-54.) Sanchez appeared with counsel before ALJ Kenneth G. Levin ("Levin") on February 25, 2011. (*Id.* at 219-41.) The ALJ issued a decision on March 14, 2011, finding that Sanchez was not disabled under the Act and was not entitled to disability insurance benefits. (*Id.* at 8-21.) Sanchez requested review by the Appeals Council on April 27, 2011. (*Id.* at 6.) On June 14, 2012, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Sanchez's request for review. (*Id.* at 1-4.) Sanchez filed this action *pro se* on August 10, 2012.

### B. The 2011 ALJ Hearing

#### 1. Testimony on Behalf of Sanchez at the Hearing

Sanchez, who appeared at the ALJ hearing on crutches (Tr. at 221),[1] was born on June 20, 1965. (*Id.* at 207.) He is five feet, eleven inches tall and weighs 240 pounds. (*Id.* at 223.) Sanchez joined the National Guard after the eleventh grade and began delivering milk when he

---

[1] Sanchez explained that on January 23, 2011, he fell and slipped on ice and fractured his right ankle. (Tr. at 221.) His right ankle fracture is unrelated to the January 10, 2009 injury. (*Id.*) The ALJ asked that Sanchez limit his testimony to his physical condition prior to the ankle injury. (*Id.*) Sanchez did not object to this instruction. (*Id.*)

was twenty-one years old. (*Id.* at 232.)  On January 10, 2009, Sanchez was delivering milk when he fell between the back of a truck and a loading dock, injuring himself. (*Id.* at 410, 624.)

Sanchez lives with his mother in a first floor apartment.  (*Id.* at 224.)  Since his injury, he has traveled by train and bus.  (Tr. at 225.)  His fiancée, who lives in the same building as Sanchez, takes care of all the household chores.  (*Id.* at 230.)  Sanchez's "ordinary day" consists of "watch[ing] television" and spending time with his fiancée.  (*Id.* at 230-31.)  He occasionally goes out for dinner but does not go to the movies, sporting events, or church.  (*Id.* at 231.)  Friends visit Sanchez but he does not socialize otherwise.  (*Id.*)  He spends his time learning magic tricks and hopes to perform at children's parties in the future.  (*Id.*)

Sanchez's milk delivery job involved lifting and carrying weights up to "180 pounds." (Tr. at 225.)  He explained that upper neck stiffness, lower back stiffness, left leg pain, left shoulder weakness, and two swollen fingers have interfered with his ability to work.  (*Id.* at 226.) He takes Tylenol and Motrin to treat the pain.  (*Id.*)  Sanchez testified that "most of the time" he has stiffness in his neck, which radiates throughout his lower back.  (*Id.* 226-27.)  His back pain restricts him from sitting down for long periods of time; for example, he is unable to watch a forty-minute television program without changing his position to alleviate the pain.  (*Id.* at 229.)

Sanchez feels pain in his entire left leg, from his ankle to his upper thigh.  (*Id.* at 228). When he walks two blocks he feels "pins and needles" throughout his leg, which forces him to sit down.  (Tr. at 228-29.)  Sanchez estimated that he could stand still for twenty-five minutes before he would start "wobbling."  (*Id.* at 229.)

Sanchez submitted that, despite having undergone left shoulder surgery in April 2009, he still feels pain and weakness in his left shoulder.  (*Id.* at 227.)  He struggles to lift heavy objects and is unable to lift his left arm over his shoulder without shaking.  (*Id.* at 232.)  Sanchez

3

is able to lift fifteen to twenty pounds. (*Id.* at 230.) After the April 2009 surgery, Sanchez began feeling numbness in his fingers which "come[es] and go[es]." (Tr. at 233, 228.) He stated that his neck, back, fingers, and left leg have remained in the same condition since January 2009, and that the pain is exacerbated by cold weather. (*Id.* at 228, 234.)

### 2. Medical Evidence

#### a. Pre-Surgery Medical Treatment (2009)

Sanchez arrived at the emergency room of Jamaica Hospital Center on January 10, 2009, complaining of right leg pain and an abrasion on his right thigh. (Tr. at 623.) X-rays of Sanchez's chest, pelvis, right ankle, femur, knee, foot, and hip all "appear[ed] normal." (*Id.* at 627-33.) He was discharged that evening in "stable" condition. (*Id.* at 638.)

On January 29, 2009, Sanchez met with Dr. Charles DeMarco, of University Orthopedics of New York, for an initial orthopedic evaluation. (*Id.* at 410.) Sanchez complained of "pain and dysfunction" in his left shoulder, which were aggravated by "overhead activities, internal rotation, and activities of heavy lifting." (*Id.*) He was also bothered by pain in the cervical spine and lumbar that radiated to the bilateral upper extremities and towards the bilateral buttock regions. (*Id.*) Sanchez described this pain as "persistent and debilitating." (Tr. at 410.) Sanchez said he experienced pain and "clicking, and popping" in the right hip, which worsened with prolonged walking, standing, heavy lifting, and ascending or descending stairs, as well as pain in his right knee and thigh. (*Id.*) Dr. DeMarco recommended that X-rays and a magnetic resonance imaging ("MRI") be taken of the affected areas as soon as possible. (*Id.* at 411.)

Sanchez underwent MRI studies under the care of Dr. Michael Singer, of Empire Open MRI, on February 10, 2009. (Tr. at 412.) His right knee MRI showed large amounts of fluid beneath the skin adjacent to the muscle in the back of the thigh and below the knee, possibly

4

representing an area of "localized inflammatory post-traumatic change." (*Id.* at 412.) An MRI of Sanchez's left shoulder showed tears throughout and in his rotator cuff. (*Id.* at 413.)

Sanchez visited Dr. Singer again on February 11, 2009, and underwent MRI studies of his cervical and lumbar spine. The MRI of his lumbar spine showed a left-sided disc bulge in his lower back that narrowed the left-side neural foramina.[2] (Tr. at 414.) The MRI of his cervical spine showed a straightening of the spine. (*Id.* at 415.) Compression of the cervical cord and spinal column was also present. (*Id.*)

When Sanchez saw Dr. DeMarco again on March 5, 2009, he continued to complain of pain in his left shoulder and cervical and lumbar spine but stated that the pain in his lower extremities had improved. (*Id.* at 418.) On physical examination, Dr. DeMarco found Sanchez had a twenty to thirty percent restriction of cervicolumbar[3] mobility. (*Id.*) After reviewing Sanchez's MRIs, Dr. DeMarco recommended surgery to repair his torn left rotator cuff. (Tr. at 419.) Dr. DeMarco referred Sanchez to Dr. Steven Touliopoulos for surgery and to Dr. Andrew Merola for an evaluation of his herniated disk, and recommended "conservative management" for Sanchez's right knee. (*Id.*)

**b. Surgery March 24, 2009**

Dr. Touliopoulos, of University Orthopedics, examined Sanchez on March 24, 2009. Sanchez complained of severe left shoulder pain, weakness, and stiffness, the effects of which made daily activities, such as "dressing and undressing," difficult. (Tr. at 422.) Dr. Touliopoulos recommended left shoulder surgery and postoperative surgery to repair Sanchez's

---

[2] Neural foramina refers to a nerve passage way in the spinal region. *Dorland's Illustrated Medical Dictionary*, 648, 650, 1127 (28th ed. 1994).

[3] Cervicolumbar means pertaining to the neck and the part of the back between the thorax and the pelvis. *Id.* at 303, 961.

left shoulder rotator cuff tear. (*Id.* at 423.) Sanchez underwent rotator cuff surgery on April 2, 2009, at St. Vincent's Hospital. (*Id.* at 424.) After the surgery, Sanchez's left upper arm was placed in shoulder sling. (*Id.* at 427.) Dr. Touliopoulos reported that the repair of the rotator cuff was complete, and that the shoulder appeared "stable in all planes of motion." (*Id.* at 425-27.)

### c. Post-Surgery Medical Treatment (2009)

#### (1) Dr. Steven J. Touliopoulos, M.D.

Sanchez saw Dr. Steven J. Touliopoulos for a post-surgery follow up visit on April 14, 2009; the report from this visit states that Sanchez had been "compliant" with all modifications and restrictions but still had "intermittent paresthesias radiating from his left shoulder to his left hand." (*Id.* at 428.) Dr. Touliopoulos noted that the examination of the shoulder was "limited" because of the recent surgery but that there were no signs of "instability." (*Id.*) There was, however, continued atrophy of the left arm. (*Id.*) Dr. Touliopoulos instructed a home exercise program and activity restrictions, prescribed Vicodin, and recommended that Sanchez continue to use a sling. (*Id.*) Dr. Touliopoulos also requested authorization for physical therapy. (*Id.* at 428.)

#### (2) Dr. Charles A. DeMarco, M.D.

On April 30, 2009, Sanchez met with Dr. Charles A. DeMarco. (Tr. at 429.) Sanchez reported "significant pain and weakness" in the left shoulder to the extent that he was awaken in the night by pain." (*Id.*) Dr. DeMarco noted "some atrophy" of the left shoulder but an otherwise "good" range of motion. (*Id.*) Dr. DeMarco's examination of Sanchez's left knee showed tenderness over the medial and lateral patellar facets. (*Id.*) Dr. DeMarco found "no

6

gross varus or valgus instability."[4]  (*Id.*)  He prescribed physical therapy for Sanchez's left shoulder and recommended "conservative treatments" for his other body parts.  (*Id.*)

After examining Sanchez on September 10, 2009, Dr. DeMarco noted that Sanchez's range of motion in his left shoulder had improved.  (Tr. at 117.)  Dr. DeMarco also noted that while Sanchez had not completed a hand consultation, x-rays of the left hand and left shoulder did not reveal any "gross abnormalities."  (*Id.*)  Dr. DeMarco found "decreased external rotational strength" of the left shoulder compared to the right shoulder.  (*Id.*)  He prescribed continued physical therapy and "conservative management" for all other body parts, and requested authorization for a left hand MRI.  (*Id.*)

### (3) Dr. Stephen G. Zolan, M.D.

On July 10, 2009, Sanchez met with Dr. Stephen G. Zolan, an orthopedic surgeon, for an independent orthopedic evaluation in connection with the claim he submitted for workers' compensation benefits.  (Tr. at 609.)  Sanchez reported pain in the left shoulder and stated that he was not taking any medication.  (*Id.*)  Dr. Zolan noted "weakness" and "abduction" of the left shoulder, and found that Sanchez's elevation, internal, and external ranges of motion were all restricted.  (*Id.* at 610.)  In his diagnosis, Dr. Zolan found that Sanchez's cervical and lumbar sprains, as well as Sanchez's right knee contusion, were all "clinically resolved," and that his left shoulder status was "post arthroscopic."  (*Id.* at 610-611.)  Dr. Zolan stated that Sanchez's prognosis was "fair," and that Sanchez had a "moderate partial disability" and would not be able to return to his job.  (*Id.*)  He found that, while Sanchez had "no limitation on his ability to sit, stand or walk," he had "no overhead use of his left arm, and could not lift or carry more than ten pounds."  (Tr. at 611.)

---

[4] Varus is an adjective used to describe the knee bent inward.  Valgus is an adjective used to describe the knee bent outward.  *Id.* at 1791, 1796.

### (4)  Dr. Daniel A. Caligiuri, M.D.

On September 21, 2009, Dr. Caligiuri examined Sanchez.  Sanchez reported "swelling, stiffness and numbness" in his left third and fourth fingers since his surgery.  (Tr. at 560.)  Dr. Caligiuri found "no detectable motor or sensory" defects, and no evidence of any "peripheral nerve entrapment."  (*Id.*)  He referred Sanchez to a neurologist and recommended that he use his left hand and fingers "as tolerated."  (*Id.* at 561.)

### (5)  Dr. Michael B. Singer, M.D.

Dr. Michael B. Singer, of Empire Open MRI, completed an MRI of Sanchez's left hand on October 6, 2009.  Dr. Singer found "mild degenerative change[s]" in the second, third, and fourth finger joints with osteophyte[5] formation.  (Tr. at 562.)  During an October 22, 2009 visit, Dr. DeMarco reviewed Dr. Singer's findings and noted that the MRI of Sanchez's left hand did not reveal any "gross abnormalities" but did show "some cyst."  (*Id.* at 504.)  Sanchez stated that the range of motion in his left shoulder was "improving."  (*Id.*)  Dr. DeMarco noted cervicolumbar paraspinal[6] tenderness, and spasm as well as a twenty to thirty percent restriction of cervicolumbar mobility.  (*Id.*)  He referred Sanchez to Dr. Andrew Merola to address his cervical spine impairments.  (*Id.*)

Sanchez began physical therapy at Bronx Physical Therapy on October 22, 2009, with treatments focused on his left shoulder.  Sanchez made improvements over time, and treatment concluded on August 20, 2010.  (Tr. 358-78.)

---

[5] Osteophyte is a bony outgrowth that limits joint movement and causes pain. *Dorland's Illustrated Medical Dictionary*. at 1202 (28th ed. 1994).

[6] Cervicolumbar paraspinal means beside or near the area pertaining to a spine or to the vertebral column. *Id*. at 1224, 1558.

### (6) Follow-up Visits with Dr. Caligiuri and Dr. Zolan

Sanchez saw Dr. Caligiuri for a follow-up examination on November 9, 2009.  (Tr. at 567.)  He continued to complain of "persistent numbness" in the third and fourth fingers but no longer complained of pain, swelling, or stiffness.  (*Id*.)  Dr. Caligiuri found "no swelling" or "localized tenderness."  (*Id*.)  He recommended that Sanchez proceed with a neurology consultation as originally advised.  (*Id*. at 568.)

On November 13, 2009, Sanchez met with Dr. Zolan for a second independent orthopedic evaluation.  (Tr. at 613.)  Dr. Zolan noted that Sanchez had recovered from injuries relating to his neck, back, and right knee but continued to have "difficulty" with his left shoulder.  (*Id*.)  Sanchez reported that he felt that his range of motion was "increasing" and that his pain was "decreasing."  (*Id*.)  On physical examination of the left shoulder, Dr. Zolan found that Sanchez's elevation, internal, and external ranges of motion were all restricted.  (*Id*. at 614.)  Dr. Zolan also noted "minimal weakness of abduction" and an "improved" range of motion.  (*Id*.)  He found that Sanchez had a "mild partial disability" but was capable of "sedentary work" that did not require "lifting more than twenty-five pounds," or "overhead work" with the left arm.  (*Id*. at 615.)

### (7) Dr. Andrew Merola, M.D.

Sanchez met with Dr. Merola of University Orthopedics, on November 30, 2009.  Dr. Merola found that Sanchez's MRI scans showed a large and small herniation in the upper spinal cord as well as a bulge.  (Tr. at 510.)  Sanchez continued to complain of persistent neck pain with bilateral upper extremity "pins, needles, numbness and tingling."  (*Id*.)  Dr. Merola suggested a neurological evaluation with Dr. Aric Hausknecht.  (*Id*.)

9

### (8) Dr. Aric Hausknecht, M.D.

Sanchez saw Dr. Aric Hausknecht, of Complete Medical Care, on December 8, 2009. (Tr. at 381.) Sanchez complained of pain in his neck, lower back, left shoulder, and left hip, and "tingling" in his left thigh. (*Id.*) He noted that the pain in his left hand and right knee had decreased, though he continued to struggle with daily activities such as shopping, sitting, and walking. (*Id.*) Dr. Hausknecht completed a motor systems test and found "weakness of the left shoulder abductor [and] atrophy of the left shoulder girdle," and that Sanchez utilized "accessory muscles" when elevating his left arm. (*Id.* at 382.) Dr. Hausknecht also found "weakness of the left ankle" muscle. (*Id.*) All other motor strength was found to be "normal." (*Id.*)

On physical examination, Dr. Hausknecht discovered cervical paravertebral[7] tenderness and associated muscular spasm, lumbosacral paravertebral tenderness and associated muscular spasm, a positive Spurling test[8] bilaterally, a positive seated straight leg raising on the left (both of which indicate radiculopathy[9]), pain and crepitus[10] in the left shoulder joint, and a positive Patrick test[11] in the left hip. (Tr. at 383.) Dr. Hausknecht found that Sanchez's range of motion was restricted throughout his spine. (*Id.*)

---

[7] Paravertebral means pertaining to the neck and area beside the vertebral column. *Dorland's Illustrated Medical Dictionary*, 303, 1233 (28th ed. 1994).

[8] During a Spurling test the examiner presses down on the top of the head while the patient rotates the head laterally and into hyperextension; pain radiating into the upper limb, on the side of the body the head is rotated to, indicates radiculopathy. *Dorland's Illustrated Medical Dictionary*, at 1900 (32d ed. 2012).

[9] Radiculopathy is a disease of the nerve roots such as from inflammation by a tumor or bony spur that causes pain throughout the part of the body the nerve serves. *Id.* at 1571.

[10] Crepitus is the grating sensation caused by the rubbing together of the dry tissue surfaces of joints. *Dorland's Illustrated Medical Dictionary*, at 391 (28th ed. 1994).

[11] A Patrick test is conducted by placing the patient into a supine position, the thigh and knee are flexed and the ankle is placed over the kneecap of the opposite leg; the knee is depressed, and if pain is produced arthritis of the hip is indicated. *Id.* at 1681.

Dr. Hausknecht reviewed Sanchez's MRIs and identified a number of maladies including a disc extrusion with an associated cord compression, a disc bulge towards Sanchez's lower back, and large amounts of fluid in the area below the right knee. (Tr. at 383.) He advised Sanchez to continue with his current course of physical therapy and to take anti-inflammatory and analgesic agents as needed for pain. (*Id.*)

### d.  Post-Surgery Medical Treatment (2010)

#### (1)  Dr. Aric Hausknecht, M.D.

On January 12, 2010, Sanchez underwent an electrodiagnostic study under the care of Dr. Hausknecht.  The test revealed evidence of radiculopathy as well as a mild, diffuse dysfunction in the nervous system. (Tr. at 540.)  Sanchez also underwent a neurodiagnostic test (to detect nervous system disorders) of the upper extremities, which came back "normal." (*Id.* at 546-47.)

On February 16, 2010, during a follow-up visit with Dr. Hausknecht, Sanchez reported that his left hip had improved but that he was still feeling pain in his neck, lower back and left shoulder, and that his back pain was radiating down to his legs. (Tr. at 550.)  He was experiencing "clinking" in his shoulder, with difficulty moving and raising his arm. (*Id.*)  The third and fourth digits of his left hand had been "feeling numb." (*Id.*)  Sanchez reported that even with the over-the-counter medication, he still found it difficult to complete daily activities. (*Id.*)

Dr. Hausknecht noted weakness in Sanchez's left shoulder and the left hand, cervical and lumbosacral paravertebral tenderness, and associated muscular spasm. (Tr. at 550.)  Sanchez had a positive Spurling test on the left and a "positive seated straight leg testing on the right" (indicating radiculopathy.) (*Id.*)  Sanchez had pain in the "tight grip" of his left hand, and had restricted motion in the cervical and lumbar spine. (*Id.*)  Dr. Hausknecht advised Sanchez to

11

continue with his established course of rehabilitation and recommended that he take "anti-inflammatory and analgesic agents as needed for pain," as well as a series of epidural steroid injections. (*Id.* at 551.)

### (2) Dr. Steven J. Touliopoulos, M.D.

Sanchez saw Dr. Steven J. Touliopoulos for a follow-up orthopedic evaluation on April 6, 2010. He complained of residual left shoulder weakness, stiffness, and discomfort. (Tr. at 516.) He reported that, while physical therapy had helped his shoulder, he had continued "difficulty lifting objects of moderate weight as well problems with performing repetitive overhead activities." (*Id.*) His maladies included "intermittent paresthesias" radiating from his neck to his left hand and down his left thigh and lower extremities. (*Id.*) Dr. Touliopoulos reported some tenderness along Sanchez's shoulder blade and found his shoulder motion was restricted. (*Id.*) The apprehension test showed some discomfort but no "gross signs of instability." (Tr. at 516.) Compared to the right arm, Sanchez's left arm showed a "mild" to "moderate" degree of "residual atrophy." (*Id.*) Dr. Touliopoulos found that Sanchez had not yet reached "maximum medical benefit" and suggested that he continue to attend physical therapy, and to take Tylenol and Motrin as needed. (*Id.*) Dr. Touliopoulos determined that Sanchez was "disabled from his employment" with respect to his left shoulder. (*Id.*)

### (3) Dr. Stephanie Dubow, M.D.

On April 9, 2010, Sanchez went for a follow-up neurology visit with Dr. Dubow. (Tr. at 403.) Sanchez reported that he had continuing neck pain and that his lower back pain was becoming worse. (*Id.*) Sanchez showed a loss of motor strength in the shoulder and hip, restricted lumbar spine flexibility, and an abnormal gait. (*Id.*) Dr. Dubow found Sanchez had a "total" disability and referred him to Dr. Arden M. Kaisman for epidural injections. (*Id.*)

### (4)  Dr. Arden M. Kaisman, M.D.

On April 15, 2010, Sanchez went for an initial examination with Dr. Arden Kaisman. Sanchez complained of neck pain radiating to both shoulders with "numbness and tingling" in the third and fourth fingers of his left hand.  (Tr. at 645.)  A physical examination revealed restriction in his shoulder rotation as well as "pain and spasm" on the left side cervical spine. (*Id*. at 645-46.)  Dr. Kaisman found "normal motor strength" in the upper extremity but "decreased sensation" in the left cervical spine.  (*Id*. at 646.)

Dr. Kaisman diagnosed Sanchez with a herniated disc with cervical radiculopathy and myofascial[12] pain syndrome, and a bulging disc with lumbar radiculopathy and myofascial pain syndrome.  (*Id*.)  He found Sanchez to be "100%" impaired, adding that he could not return to work because of "neck and lower back pain."  (Tr. at 650-51.)

### (5)  Dr. Stephen G. Zolan, M.D.

Sanchez saw Dr. Stephen G. Zolan for an independent orthopedic consultation on May 14, 2010.  (Tr. at 617.)  Dr. Zolan reported that, since Sanchez's last evaluation, he had begun treatment for his back and neck, and continued to receive treatment for his left shoulder.  (*Id*.) Sanchez had a flattened cervical and lumbar curve and his cervical, lumbar, and left shoulder ranges of motion were restricted.  (*Id*. at 618.)  Dr. Zolan determined that Sanchez could stand on his heels and toes.  (Tr. at 618.)  Sanchez's straight leg raising test was negative, meaning there were no signs of radiculopathy.  (*Id*.)  He diagnosed Sanchez with "frozen shoulder status post arthroscopy left side" and found "exacerbation of cervical and lumbar myfasical pain syndromes."  (*Id*. at 619.)  Dr. Zolan determined that Sanchez had a "marked partial disability" which allowed him to do "light sedentary work" with no "prolonged period of sitting, standing,

---

[12] Fascia is a sheet or band of fibrous tissue that lies deep to the skin or surrounds muscles and various other organs of the body.  Myofascial means pertaining to or involving the fibrous tissue surrounding and associated with muscle tissue. *Dorland's Illustrated Medical Dictionary*, 608, 1092 (28th ed. 1994).

or walking and no repetitive or overhead use of the left arm and no lifting more than ten pounds." (*Id.*)

### (6) Follow-up Visit with Dr. Dubow

On June 4, 2010, Sanchez saw Dr. Dubow. Sanchez reported that the three epidural steroid injections he had received in his lower spine had not helped. (Tr. at 405.) He complained of worsening lower back pain that was exacerbated when he sat, bent over, or stood. (*Id.*) Sanchez reported that his left shoulder was still being treated but that it was "ok." (*Id.*) A physical examination showed a loss of motor strength in the left hip flexion, pain with spasms in the left lumbosacral spine, a restriction in lumbosacral spine forward flexion, a positive straight leg raising test bilaterally, and an abnormal gait. (*Id.*) Dr. Dubow diagnosed Sanchez with left "shoulder pain/atrophy" and cervical and lumbar "derangement." (*Id.*) She indicated that Sachez had a "total" disability, and recommended anti-inflammatory drugs for pain and that he continue chiropractic treatment. (*Id.*)

### (7) Follow-up Visit with Dr. Hausknecht

Sanchez returned to Complete Medical Care for a follow-up with Dr. Hausknecht on August 6, 2010. He complained of lower back pain and "intermittent" neck pain without radiation to the upper extremities, but said that over the counter anti-inflammatory drugs helped control the pain. (Tr. at 407.) Dr. Hausknecht indicated that Sanchez had a "total" disability and diagnosed him with cervical and lumbar derangement. (*Id.*)

### (8) Follow-up Visit with Dr. Zolan

On September 24, 2010, Dr. Zolan reexamined Sanchez. Sanchez complained of neck, back, and left shoulder problems. (Tr. at 640.) On physical examination, Sanchez had a flattened cervical and lumbar curve. (*Id.* at 641.) Sanchez's cervical, lumbar and left shoulder

14

ranges of motion were restricted. (*Id.*) Dr. Zolan saw improvements since Sanchez's prior examination on May 14, 2010; for example, he found that Sanchez's shoulder had improved but that the exacerbation of cervical and lumbar myofacial pain syndrome was "unchanged." (*Id.* at 642.) Dr. Zolan indicated a "moderate partial disability," and found Sanchez capable of doing "light sedentary repetitive work with no prolonged sitting, standing, or walking, and no lifting over fifteen pounds." (*Id.*)

### (9) Follow-Up Visit with Dr. Charles A. DeMarco, M.D.

On September 29, 2010, Sanchez went for a follow-up with Dr. DeMarco. Sanchez complained of residual symptoms of left shoulder "weakness, stiffness, discomfort, and difficulty lifting objects of any moderate to heavy weight and performing repetitive overhead activities." (Tr. at 681.) He continued to complain of "intermittent" paresthesisas and dysfunction over the ring and long fingers of the left hand. (*Id.*) Dr. DeMarco noted no "gross signs" of shoulder instability, though there was some "discomfort" with the apprehension test. (*Id.*) Dr. DeMarco listed Sanchez as "100%" impaired on Sanchez's worker's compensation form. (*Id.* at 683.)

### e. Testimony of Dr. Charles Plotz, Medical Expert

Dr. Charles Plotz testified as a medical expert at the hearing. (Tr. 234-39.) After reviewing the record and listening to Sanchez testify, Dr. Plotz asserted that Sanchez had a "limitation" on his ability to lift heavy objects. (*Id.* at 235.) He further stated that Sanchez had "residuals" in the left shoulder and should "not be using his left arm for lifting more than twenty pounds." (*Id.*) Regarding Sanchez's back and leg issues, Dr. Plotz found no medical evidence to substantiate Sanchez's complaints. (*Id.* at 235-36.) He found no Listing-level impairment regarding Sanchez's lower back and leg maladies. (*Id.*) Dr. Plotz testified that Sanchez had the residual functional capacity ("RFC") to sit, stand, and walk for "six hours in the course of an

eight-hour day," and that his ability to lift and carry was limited to "no more that twenty pounds." (*Id.* at 236.)

### f. Vocational Expert Testimony

Miriam Green, a vocational expert, also testified at the hearing. (Tr. at 239-40.) She was asked to determine what "sedentary and light jobs" would be available to a person: (1) capable of sitting, standing and/or walking in any combination for a total of six hours in an eight-hour workday but no more than two hours at one time; (2) able to lift or carry no more than ten pounds; and (3) who should avoid reaching overhead with his left non-dominant arm. (*Id.* at 239.) She was also asked to consider Sanchez's "age, education, and prior work experience." (*Id.*) She asserted that a person with Sanchez's qualities could work a number of jobs, such as mail operator, surveillance system monitor, gate guard, and charge account clerk. (*Id.*) Green testified that if a gross manipulation of the left hand was added to Sanchez's description, there would still be jobs available for Sanchez. (*Id.* at 240.) When Sanchez asked her whether these jobs would still be available if the hypothetical person she described would have to miss "an extra two days a month for medical management purposes," Green responded that the extra two days would "preclude competitive work all together." (*Id.*)

## C. The Findings of ALJ Kenneth G. Levin

Kenneth G. Levin issued his decision on March 14, 2011, finding that Sanchez was not disabled and therefore not eligible for supplemental security income payments under Sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Act. (Tr. at 11-18.) Levin first determined that Sanchez had not engaged in "substantial gainful activity" since January 10, 2009. (Tr. at 17.) He then found that, while Sanchez had a "severe combination of left shoulder internal derangement, cervical spine disc disease and radiculopathy," he did not have a Listings-level

impairment. (*Id.* at 16.) Levin concluded that, despite Sanchez's impairments, he had the RFC

to sit, stand, or walk for up to six hours in an eight-hour workday with normal breaks, as long as

he did not have to stand or walk for more than two hours without a break. (*Id.* at 17.) He also

found that Sanchez had the ability to lift ten pounds. (*Id.*) Levin found that Sanchez could not

perform overhead reaching or repetitive pushing with his left arm; he further limited Sanchez's

RFC to simple, routine, and repetitive work tasks. (*Id.*)

Levin found that Sanchez would be unable to perform his past relevant work based on

evidence of internal derangement of Sanchez's left shoulder, or discogenic[13] disease of his

cervical spine, both of which, he determined, would affect Sanchez's ability to lift and carry.

(Tr. at 16-17.) Levine noted that Dr. Plotz's testimony that Sanchez could lift up to twenty

pounds was substantiated by Sanchez's own testimony. (*Id.* at 17.) He then considered what

jobs were available in the national economy for Sanchez given his RFC, age, education,

vocational factors, and the testimony of the vocational expert. (*Id.*) Levin found that Sanchez

could perform a "significant number" of jobs that existed in the national economy. (*Id.*) He

therefore concluded that Sanchez was not disabled within the meaning of the Act. (*Id.* at 18.) In

reaching this conclusion, the ALJ reasoned that Sanchez's "complaints about his back and leg

not only have no support in a proven medically-determinable impairment, but his description of

the way the symptoms affect his left leg makes no anatomical sense." (Tr. at 15.) He noted that

of all the doctors that examined Sanchez, only Dr. Kaisman was able to find any reason for his

back complaints. (*Id.*)

Levin found "no medical reason" that would support Sanchez's limited ability to walk or

stand. (*Id.* at 16.) The ALJ took Sanchez's testimony about traveling by bus and subway to

refute his claim that he could not walk for two blocks. (Tr. at 17.)

---

[13] Discogenic is pain caused by the derangement of an intervertebral disk. *Id.* at 447.

**D. Appeals Council Review**

Sanchez requested review of the ALJ's decision by the Appeals Council on March 14, 2011, and submitted additional evidence that related to his January 23, 2011 ankle injury. (*Id.* at 705-918.)  The Appeals Council denied Sanchez's request for review on June 14, 2012. (*Id.* at 1.)

## III. DISCUSSION

**A. Standard of Review**

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); accord *Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)).  Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); accord *Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g).  If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); accord

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). See, e.g., *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); accord *Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d

1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.  See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand).  Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence."  *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When "new and material evidence" is submitted, the Appeals Council may consider the additional evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "New evidence" refers to "any evidence that has not been considered previously during the administrative process."  *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B. Determination of Disability

### 1.  Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).

21

If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis).  The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities.  *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms."  20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49.  If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49.  The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record."  *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility

determination).  In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference").  A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a pro se claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)).  This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

### 3.   The ALJ Failed to Properly Consider the Evidence.

#### a.   The ALJ applied the five-step sequential analysis, but erred with his application of the legal principles.

The court must first determine whether the Commissioner applied the correct legal

principles in assessing Sanchez's eligibility. *Rosa*, 168 F.3d at 77.  In his Complaint, Sanchez

claimed that ALJ's decision "was erroneous, not supported by evidence on the record, and/or

contrary to the law." (Pet'r's Compl. ("Compl.") at ¶ 9.)

In reaching his conclusion, the ALJ completed the five-step sequential analysis as

required by 20 C.F.R. §§ 404.1527, 416.920.  However, the result of the analysis was flawed as a

result of the ALJ's improper application of the treating physicians rule.  First, the ALJ found that

Sanchez has not engaged in substantial gainful activity since January 10, 2009, the date of his

application. (Tr. at 17.)  At step two of the analysis, the ALJ found that since January 10, 2009,

Sanchez has had a "severe" combination of left shoulder internal derangement, cervical spine

disc disease and radiculopathy. (*Id.*)  Under step three, the ALJ determined that Sanchez did not

carry his burden of demonstrating a Listing-level impairment because he did have an impairment

that meets or medically equals the requirements in the Listings. (Tr. at 17.)  At step four, the

ALJ determined that Sanchez had the RFC to perform work tasks that are simple, routine, and

repetitive. (*Id.*)  The ALJ's determination of Sanchez's RFC was not supported by substantial

evidence.  In the final step of the analysis, the ALJ determined that a "significant number" of

light and sedentary jobs exist in the national economy that Sanchez could perform. (*Id.*)

#### b.  The ALJ violated the treating physician's rule.

The ALJ failed to satisfy the requirement that an ALJ explain the weight given to a

treating physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).  While the ALJ did consider the

opinions of Sanchez's treating physicians, he did not explain what weight, if any, the treating

physician's opinions were given in comparison to Dr. Plotz's opinion.

To support his finding that Sanchez's lower back complaints were unfounded, the ALJ

relied on Dr. Plotz's testimony that the record did not reveal any condition that explains

Sanchez's lower back complaints. (Tr. at 15.)  The ALJ found that Sanchez should have no more

than a mild limitation on the amount of time he can sit and stand in a workday.  (*Id.* at 16.)

Sanchez's treating physicians, Dr. Hausknecht, Dr. Dubow, Dr. DeMarco, Dr. Kaisman and Dr.

Zolan, (who completed three independent orthopedic evaluations on Sanchez), all found that

Sanchez had limited cervical rotation.  (*Id.* at 405, 407, 418, 550, 641, 646.)  Dr. Zolan

recommended that Sanchez's walking, sitting, and standing "not be prolonged." (Tr. at 642.)

The opinions of these treating physicians were not properly considered in the ALJ's decision.

Although the ALJ considered Dr. Hausknecht and Dr. Dubow to be Sanchez's "main

treating" physicians, he did not explain what weight he gave to their medical opinions.  (Tr. at

14.)  On multiple occasions, Dr. Hausckencht and Dr. Dubow opined that Sanchez had "total"

disability.  (*See id.* at 403, 405, 406.)   The ALJ failed to explain if Dr. Hausknecht and Dr.

Dubow's opinions were given controlling weight, or any weight at all.  Dr. DeMarco and Dr.

Kaisman both found Sanchez to be "100%" disabled (*Id.* at 638, 650-51), yet the ALJ failed to

explain what weight he gave their medical opinions as well.

The ALJ did not give sufficient explanation of the relevant factors when failing to give

the treating physicians' opinions controlling weight.  Sanchez's treating physicians consistently

found that he had limited cervical rotation.  (Tr. at 405, 407, 418, 550, 641, 646.)  Sanchez's own

testimony, which the ALJ found "reasonably credible" (*id.* at 15), described how his back pain

prevents him from sitting, standing, or walking for long periods of time.  (*Id.* at 229.)  The ALJ

26

failed to sufficiently evaluate the treating physicians' opinions or explain how the record as a whole did not support the opinions. The ALJ gave more weight to Dr. Plotz's opinion than to the opinions of the treating physicians, but provided no justification or explanation. This resulted in an improper RFC determination that is not supported by substantial evidence.

### c. Despite failing to provide a specific rationale for determining that Sanchez did not have a Listing-level impairment, the ALJ's decision is supported by substantial evidence.

In the third step of his analysis, the ALJ determined that Sanchez did not have a Listing-level impairment. While the ALJ found that Sanchez had a "severe combination of left shoulder internal derangement, and cervical spine disc disease and radiculopathy," (Tr. at 16) (internal quotations omitted), he did not find that Sanchez had a Listing-level impairment. (*Id.*) In reaching this conclusion, the ALJ stated that Sanchez "does not have a Listing-level impairment, and his attorney has not argued otherwise." (*Id.*) Other than finding that Sanchez's attorney had "not argued otherwise," the ALJ failed to provide a specific rationale in support of the conclusion that Sanchez's shoulder, back and leg impairments did not meet or medically equal the criteria in the Listings. (Tr. at 16-17.) The government argues that although the ALJ did not explain his rationale for finding that Sanchez's "impairments meet or medically equal the relevant listings, that finding is nonetheless supported by substantial evidence and must be upheld." (Def. Mem. at 24.)

Even if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing requirement, a court may nonetheless uphold the ALJ's determination if it is supported by substantial evidence found in "other portions of the ALJ's decision." *Berry v. Schweiker*, 675 F.2d 463, 368, 469 (2d Cir. 1982). The reviewing court must be able to "reasonably infer" what criteria the ALJ found lacking. (*See id.* at 469.)

Here, though Levin did not explain his rationale for finding that Sanchez did not have a Listing-level impairment, it can be reasonably inferred that the ALJ was referring to Dr. Plotz's testimony and review of Sanchez's medical records. (*See* Tr. at 235-36.) Dr. Plotz answered question pertaining to Sanchez's back and leg, and was then asked if he believed Sanchez had any Listing-level impairment. (*Id.*) He responded that he did not believe that Sanchez had a Listing-level impairment. (*Id.*) This testimony was based on of Dr. Plotz's understanding of the record. The Court finds that the ALJ's opinion is supported by substantial evidence in the record.

### d. The ALJ's conclusion that Sanchez did not have a Listing-level impairment is supported by substantial evidence.

Sanchez's medical records do not support a finding that his shoulder ailments meet or medically equal the Listing-level impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Section 1.02(B)(2)(c) of Appendix 1 (major dysfunction of a joint) requires that Sanchez show an inability to perform fine and gross movements, meaning an "extreme loss of function of both upper extremities" such as "an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. pt. 404 Subpt. P. App. 1. Sanchez's medical records present no evidence of right shoulder problems, and while there is evidence of residual pain in the left shoulder, the evidence does not demonstrate that he is unable to perform gross movements effectively.

Sanchez has also failed to establish that his back injuries meet or medically equal a Listing-level impairment. In order to support a finding of a Listing-level impairment for a spinal disorder, as described in Section 1.04 (disorders of the spine), Sanchez's medical records must present evidence of:

(a) nerve root compression . . . limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if the injury involves the lower back, positive straight leg raising (seated and supine); (b) spinal arachnoiditis . . . which results in the need to change positions more than once every two hours; or a finding of (c) lumbar spinal stenosis resulting in an inability to ambulate effectively . . . as capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.

20 C.F.R. Pt. 404 Subpt. P. App. 1. Although Sanchez had a number of positive seated straight leg raising tests, (Tr. at 383, 405, 550), his medical records show no evidence of positive supine straight leg raising tests, and the records do not present evidence of the requisite motor loss. Sanchez was not diagnosed with spinal arachnoiditis and thus cannot establish a Listing-level impairment under subsection (b). Sanchez testified that he was able to take public transportation, walk without assistance, and drive, which establish that he was able to ambulate effectively. (*See* Tr. at 224, 228-29.)

Sanchez also failed to establish that his knee pain met or medically equaled a Listing-level impairment as described in Section 1.00 (musculoskeletal system). Sanchez's medical records present no evidence that Sanchez was unable to "ambulate effectively" and Sanchez never complained of "an extreme limitation of the ability to walk" or "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device." *See* 20 C.F.R. Pt. 404 Subpt. P. App. 1 § 1.00(B)(2)(b). Thus, the ALJ's determination that Sanchez did not have a Listing-level knee impairment was supported by substantial evidence.

Although the ALJ failed to expressly state a rationale for his finding that Sanchez did not have a Listing-level impairment, the determination is supported by substantial evidence found in Sanchez's medical records that his ailments do not meet or medically equal the relevant listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

29

> e. **Because the ALJ violated the treating physician's rule his determination of Sanchez's RFC was not supported by substantial evidence.**

Step four of the analysis required the ALJ to determine Sanchez's RFC by analyzing Sanchez's medical history and the opinions of Sanchez's treating physicians. *See* 20 C.F.R. § 404.1527(d); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The Commissioner argues that the ALJ "reasonably relied on Dr. Plotz's testimony" in determining Sanchez's RFC. (Def. Mem. at 24.) As was explained in part B-3-b, the ALJ failed to discuss the weight given to Sanchez's treating physicians. The ALJ's failure to explain what weight was given Sanchez's treating physicians resulted in an improper RFC determination that is not supported by substantial evidence.

> f. **The ALJ's determination that Sanchez could perform work in the national economy was not supported by substantial evidence.**

After reviewing the testimony of the vocational expert, the ALJ determined that there were a number of jobs in the national economy that Sanchez could complete. (Tr. at 16.) The vocational expert relied on the ALJ's RFC determination when determining what jobs would be available for Sanchez in the national economy. (*Id*. at 239.) The ALJ then relied on the vocational expert's determination to show that the Commissioner had carried its burden and that Sanchez could find work in the national economy. (*Id*. at 16.) Because the RFC was improperly determined, substantial evidence does not exist to support the ALJ's determination that a significant number of jobs are available in the national economy for Sanchez.

## C. Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand may be appropriate if "the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.2d 72, 82-83 (2d Cir.

1999).  In this case, the ALJ committed legal error by improperly applying the treating physician rule.

### III. CONCLUSION

For the reasons set forth above, I recommend that Defendant's motion be **DENIED**, and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) to consider a determination of disability that accords proper weight to Sanchez's treating physicians.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Colleen McMahon, 500 Pearl Street, Room 1640, and to the chambers of the undersigned, 500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a waiver of those objection in both the District Court and on later appeal to the United States Court of Appeal.  *See Thomas v. Arn*, 746 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

**Dated: May 6, 2014**
**New York, New York**

**Respectfully Submitted,**

**MAILED BY CHAMBERS**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**